# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| **MAGNACROSS LLC,** | Civil Action No. 3:18-cv-02368-L |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| **A.B.P. INTERNATIONAL, INC.,** | |
| Defendant. | |

## PLAINTIFF MAGNACROSS LLC'S OPPOSITION TO DEFENDANT A.B.P. INTERNATIONAL, INC.'S MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

December 18, 2018

OF COUNSEL:

David R. Bennett
Direction IP Law
P.O. Box 14184
Chicago, IL 60614-0184
(312) 291-1667
dbennett@directionip.com

**JAY JOHNSON**
State Bar No. 24067322
**D. BRADLEY KIZZIA**
State Bar No. 11547550
**KIZZIA JOHNSON, PLLC**
1910 Pacific Ave., Suite 13000
Dallas, Texas 75201
(214) 451-0164
Fax: (214) 451-0165
jay@kpllc.com
bkizzia@kpllc.com

*Attorneys for Plaintiff Magnacross LLC*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... ii

TABLE OF EXHIBITS ................................................................................................... iv

I.     INTRODUCTION .................................................................................................1

II.    STATEMENT OF THE CASE .............................................................................2

III.   STATEMENT OF FACTS....................................................................................2

    A.   Background of the Invention........................................................................ 3

    B.   U.S. Patent No. 6,917,304 – Independent Claims 1 and 12........................... 4

IV.  STATEMENT OF LAW .......................................................................................5

    A.   Invalidity Under 35 U.S.C. §101 ................................................................ 5

    B.   Standard for Sufficiency of Complaint ........................................................ 7

V.    ARGUMENT ........................................................................................................8

    A.   The Claims are Patentable Under 35 U.S.C. §101 ........................................ 9

        1.   Claims 1 and 12 Are Directed to Patent-Eligible Subject Matter ............................ 9

        2.   The Claims Include Inventive Steps ..................................................... 16

    B.   Magnacross Has Sufficiently Alleged Direct Infringement of Claim 12...................... 19

CONCLUSION.............................................................................................................20

i

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
  882 F.3d 1121 (Fed.Cir. 2018)..................................................................................... 8

*Alice Corp. Pty. v. CLS Bank Int'l*,
  134 S.Ct. 2347 (2014).................................................................................... passim

*Ashcroft v. Iqbal*,
  129 S.Ct. 1937 (2009)................................................................................. 8, 9

*Bascom Global Internet Serv. v. AT&T Mobility LLC*,
  827 F.3d 1341 (Fed.Cir. 2016)............................................................ 7, 17, 20, 21

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007)....................................................................................... passim

*Berkheimer v. HP Inc.*,
  881 F.3d 1360 (Fed.Cir. 2018)........................................................................ 19

*Commil USA, LLC v. Cisco Sys.*,
  135 S.Ct. 1920 (2015)................................................................................... 5, 6

*Core Wireless Licensing v. LG Elecs., Inc.*,
  880 F.3d 1356 (Fed.Cir. 2018)............................................................. 11, 12, 13, 14

*DDR Holdings, LLC v. Hotels.com*,
  773 F.3d 1245 (Fed.Cir. 2014)........................................................... 7, 11, 13

*DealerTrack, Inc. v. Huber*,
  674 F.3d 1315 (Fed.Cir. 2012)........................................................................ 20

*Disc Disease Sols. Inc. v. VGH Sols., Inc.*,
  888 F.3d 1256 (Fed.Cir. 2018)............................................................. 9, 21, 22

*Elec. Power Grp., LLC v. Alstom S.A.*,
  830 F.3d 1350 (Fed.Cir. 2016)........................................................................ 20

*Enfish, LLC v. Microsoft Corp.*,
  822 F.3d 1327 (Fed.Cir. 2016)..................................................................... passim

*Erickson v. Pardus*,
  551 U.S. 89 (2007)................................................................................... 8, 21

*Finjan, Inc. v. Blue Coat Sys.*,
  879 F.3d 1299 (Fed.Cir. 2018)........................................................... 7, 11, 13

*Intellectual Ventures I LLC v. Capital One Bank (USA)*,
  792 F.3d 1363 (Fed.Cir. 2015)........................................................................ 20

*Mayo Collaborative Services v. Prometheus Laboratories, Inc.*,
  132 S.Ct. 1289 (2012)................................................................................. 6, 7

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed.Cir. 2016)..................................................................... passim

*McZeal v. Sprint Nextel Corp.*,
   501 F.3d 1354 (Fed.Cir. 2007)............................................................................ 9, 21

*Microsoft Corp. v. i4i Ltd. P'ship*,
   131 S.Ct. 2238 (2011)...................................................................................... 5, 6

*Reeves v. Sanderson Plumbing Prods., Inc.*,
   530 U.S. 133 (2000).......................................................................................... 5

*Visual Memory LLC v. NVIDIA Corp.*,
   867 F.3d 1253 (Fed.Cir. 2017)............................................................................ 6

**Statute**

35 U.S.C. §282.................................................................................................... 5

**Rules**

Rule  8(a)(2), Fed.R.Civ.P. .................................................................................... 8

Rule 12(b)(6), Fed.R.Civ.P. .................................................................................... 5

## <u>TABLE OF EXHIBITS</u>

Exhibit A       U.S. Patent No. 6,917,304

Exhibit B       Amendment and Response to First Office Action for Serial No. 09/402,262
                dated December 14, 2004

Exhibit C       Notice of Allowability dated February 11, 2005

Plaintiff Magnacross LLC ("Magnacross") hereby opposes Defendant A.B.P. International, Inc.'s ("ABP" or "Defendant") Motion to Dismiss for Failure to State a Claim (Dkt. No. 13) ("ABP's Motion")).

## I.    INTRODUCTION

ABP argues that the claims of U.S. Patent No. 6,917,304 are not eligible for patenting under 35 U.S.C. §101 ("§101").  On the first step of the §101 analysis, ABP argues that the claims are directed to the abstract idea of "transmitting information from multiple sensors."  Although the claims fall under this very broad field, which includes both wired and wireless transmissions, the claims solve a specific problem related to wirelessly transmitting information from multiple sensors: inefficient bandwidth usage when wirelessly transmitting data from local data sensors have substantially different data rate requirements.  As explained in the patent's specification, although there were many attempts to solve the problem, none were effective.  The inventors invented a specific apparatus for dividing the communications channel for transmitting the data and allocating data from the local sensors to the sub-channels to more efficiently use bandwidth, as shown in claim 12.  Claim 1 is the related method claims.  The claims are patent eligible because they are directed to a specific way to solve a problem in computer technology that improves computer functionality.

Even if the Court finds that the claims are directed to Defendant's alleged abstract idea, under the second step of the §101 analysis, the claims are more than drafted to monopolize the idea of "transmitting information from multiple sensors."  Claim 12 requires a multiplexer that asymmetrically divides a communications channel into sub-channels such that the carrying capacities of the sub-channels are unequal; and a control means that allocates data  from the local data sensors to one or a group of the sub-channels in accordance with the substantially different data rate requirements of the local sensors.  As explained in the patent specification and

1

prosecution history, these features are neither generic or conventional.  Similarly, claim 1 requires dividing the communications channel asymmetrically and allocating data from the local data sensors with substantially different data rates in a particular way.  Claims 1 and 12 therefore do not monopolize the overbroad idea of "transmitting information from multiple sensors."

Finally, ABP's contention that Magnacross has not provided sufficient details to plead infringement relies on an incorrect analysis of the law.  The complaint is only required to have a short and plain statement of the claim and there is no heightened fact pleading standard.  The complaint puts ABP on fair notice of the claim of infringement, the accused product, and the basis for the claim.  No further factual pleadings are required.

The Court should therefore deny Defendant's motion to dismiss.

## II.    STATEMENT OF THE CASE

On September 6, 2018, Magnacross filed a complaint for patent infringement alleging that ABP products infringed at least claim 12 of U.S. Patent No. 6,917,304. (Dkt. No. 1).  On November 13, 2018, ABP filed this motion to dismiss alleging that all claims of the '304 patent are invalid under §101 and that Magnacross has failed to properly plead infringement.  (Dkt. No. 13).  Magnacross files this opposition to ABP's motion to dismiss.

## III.    STATEMENT OF FACTS

The patent-at-issue, the '304 patent, is titled "Wireless Mutliplex [*sic*] Data Transmission System."  (Dkt. No. 15 at ¶9, Ex. A at cover).  Magnacross owns all right, title and interest in the '304 patent.  (*Id.* at ¶10).  Defendant does not dispute that this Court has subject matter jurisdiction over this action and venue is proper in this district.  (Dkt. No. 14 at ¶¶3-7).

2

A.      **Background of the Invention**

The invention relates to methods and apparatuses for the wireless transmission of data through a communications channel from at least two local data sensors with substantially different data rates to a data processor.  (Ex. A at col. 1:4-7, col. 1:60-2:13).

Prior to the filing of the initial application in 1997, the inventors recognized that there were problems with the efficient transmission of data to data processors from local data sensors that had substantially different data rates.  (Ex. A at col. 1:4-7; col. 2:5-13).  Conventional methods of transmitting sensor data usually transmitted data from data sensors to the data processors using cables that put limitations on the convenience and operations of the equipment.  (*Id.* at col. 1:37-40).  Attempts were made to improve the use of cable connectors, but none eliminated the inconvenience of using cables.  (*Id.* at col. 1:42-50).

Then there were attempts to achieve wireless transmission from the data sensors to data processors using conventional wireless transmission systems, but they had shortcomings.  (*Id.* at col. 1:51-53).  One main issue with the conventional wireless transmission systems is they resulted in inefficient bandwidth utilization due to excessive bandwidth requirement for some combinations of data sensors.  (*Id.* at col. 1:50–2:1).  For example, in a system in which there are both sensors that require high data transmission rates and sensors that require lower data transmission rates, a conventional system would set aside the same amount of bandwidth for both types of sensors necessarily resulting in overutilization or underutilization of bandwidth requirements.  (*See id.*; col. 3:19-27).  Other attempts to solve the problem were unsuccessful.  (*Id.* at col. 2:14-59).

The '304 patent's specification cites to a dozen U.S. and foreign patent that attempted, but failed, to solve the problem.  (*Id.* at col. 2:27-59).  For example, European Patent EP 0 483 549A2, assigned to IBM, separated the control channel from the data channel, to allow the control channel bandwidths to be made significantly smaller.  (*Id.* at col. 2:16-26).  In another foreign patent, WO

3

89/09522, the claimed method allocated "bandwidths in a broadband packet switching network using a set of parallel packet channels that acted as a single data link connections between packet channels." (*Id.* at col. 2:27-36). And, another foreign patent example, EP 0515 728 A2, used a specific "protocol for establishing a duplex link between first and second data link devices." (*Id.* at col. 2:37-40). None of these patents solved the problem of inefficient use of bandwidth when transmitting data from local sensors having substantially different data transmission rates.

The inventors therefore created a method and apparatus by which local data sensors with substantially different data rates required for data transmission would have the data transmitted wirelessly over an asymmetrically divided communication channel such that the data from the sensors is allocated to ones or groups of the sub-channels based on the data carrying capacities of the sub-channels. (*See id.* at col. 3:2-27; col. 7:30-45; col. 8:20-35). For example, a data sensor with higher data rate requirements was assigned a sub-channel or group of sub-channels with a higher data rate capacity and a data sensor with lower data rate requirements was assigned a sub-channel with a lower data rate capacity. (*E.g.*, *see id.* at col. 3:2-27; col. 5:22-26).

**B.     U.S. Patent No. 6,917,304 – Independent Claims 1 and 12**

The '304 patent involves, *inter alia*, a method and apparatus for wireless transmission of data through a communications channel between at least two local data sensors and a data processing function to receive data from the local sensors. (*Id.* at Ex. A at Abstract). Claim 12, which is asserted in the Complaint, is an apparatus for the wireless transmission of data from data sensors to a data processor:

> 12. Apparatus for wireless transmission of data in digital and/or analogue format through a communications channel from at least two local data sensors to a data processing means, the apparatus comprising a multiplexer adapted to effect division of said communications channel into sub-channels, and a transmitter adapted to transmit said data through said sub-channels accordingly; characterized by

      a) said multiplexer being adapted to divide said communications channel asymmetrically whereby the data carrying capacities of said sub-channels are unequal; and

      b) control means adapted to allocate data from said local data sensors to respective ones or groups of said communications sub-channels in accordance with substantially different data rate requirements from said local sensors.

(*Id.* at col. 8:20-35).  The apparatus claim comprises "a multiplexer," "a transmitter," and "control means."  Claim 1 is a corresponding method claim.

## IV.    STATEMENT OF LAW

The standard for ruling on a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) is whether, under any plausible reading of the pleadings, the plaintiff would be entitled to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  When evaluating such a motion, "the court must draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

### A.    Invalidity Under 35 U.S.C. §101

A patent is presumed valid and the burden of establishing invalidity of any patent claim rests on the party asserting invalidity.  35 U.S.C. §282; *Microsoft Corp. v. i4i Ltd.*, 131 S.Ct. 2238, 2245 (2011) ; *Commil USA, LLC v. Cisco Sys.*, 135 S.Ct. 1920, 1929 (2015).  This applies any time an infringer argues "that the patent should never have issued in the first place."  *Microsoft*, 131 S.Ct. at 2242.  Invalidity must be proven by clear and convincing evidence.  *Id.* at 1250; *Commil*, 135 S.Ct. at 1929.  Moreover, on "a motion to dismiss under Rule 12(b)(6), [ ] all factual inferences drawn from the specification must be weighed in favor of [ ] the non-moving party." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261-62 (Fed.Cir. 2017).

Section 101 defines patent eligible subject matters as "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof."  35

U.S.C. §101.  All inventions in effect embody, use, or apply laws of nature, natural phenomena, or abstract ideas so an invention is not patent-ineligible merely because it involves one of these. *Alice Corp. Pty. v. CLS Bank Int'l*, 134 S.Ct. 2347, 2354 (2014).  Although patenting a building block of ingenuity risks disproportionately tying up the use of the underlying ideas, integrating the building blocks into something more "pose[s] no comparable risk of pre-emption." *Id.* at 2354-55.

The analysis of whether an invention is directed to an abstract idea under §101 consists of two steps.  *Mayo Collaborative Serv. v. Prometheus Labs., Inc.*, 132 S.Ct. 1289, 1296-1297 (2012). The first step "determine[s] whether the claims at issue are directed to one of those patent-ineligible concepts."  *Alice Corp.*, 134 S.Ct. at 2355.  If the claims are not directed to a patent ineligible concept, then the analysis ends because the claims are patentable under §101.

However, if the Court finds that the claims are directed to a patent ineligible concept, then the Court turns to the second step and "examine[s] the elements of the claim to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed abstract idea into a patent-eligible application."  *Alice Corp.*, 134 S.Ct. at 2357 (*citing Mayo*, 132 S.Ct. at 1294, 1298).  Even if an invention recites an abstract idea, the invention is patentable if it has "additional features to ensure that the claim is more than drafted to monopolize the abstract idea."  *Id.* (*citing Mayo*, 132 S.Ct. at 1297).  The limitations must be considered both individually and as an ordered combination in this step.  *Id.* at 2355.

If "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks," then the claims are not abstract. *DDR Holdings, LLC v. Hotels.com*, 773 F.3d 1245, 1257 (Fed.Cir. 2014).  Similarly, claims are patent eligible when they "enable[] a computer [ ] system to do things it could not do before." *Finjan, Inc. v. Blue Coat Sys.*, 879 F.3d 1299, 1305 (Fed.Cir. 2018). Even if the claims use only

generic computers, software claims are patent-eligible if the claims do not preempt the alleged abstract idea on the Internet or on generic computer components performing conventional activities. *Bascom Global Internet Serv. v. AT&T Mobility LLC*, 827 F.3d 1341, 1350-51 (Fed.Cir. 2016); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1338 (Fed.Cir. 2016). So long as the novelty is not simply using a computer, "processes that automate tasks that humans are capable of performing are patent eligible if properly claimed." *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1313 (Fed.Cir. 2016).

Although determination of patent eligibility under §101 is a question of law, there can be subsidiary fact questions that must be resolved in route to the ultimate legal determination. *Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1127-1128 (Fed.Cir. 2018).   For example, whether the claim elements or claimed combination are well-understood, routine, or conventional is a question of fact.  *Id.*  Such fact questions may not be able to be answered adverse to the patentee based on the sources properly considered in a motion to dismiss, such as the complaint, patent, and materials subject to judicial notice.  *Id.*

### B.    Standard for Sufficiency of Complaint

Under Rule 8(a)(2), Fed.R.Civ.P., a pleading is sufficient if it contains "a short and plain statement of the claim showing that the pleader is entitled to relief."  As opposed to a "heightened fact pleading of specifics," a complaint is only required to have allegations sufficient to show that the plaintiff is plausibly entitled to relief. *Twombly*, 550 U.S. at 555-56, 570.  Whether a complaint states a plausible claim for relief is a context-specific task that requires the Court "to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1950 (2009).  "Specific facts are not necessary; the statement need only 'give the defendant fair notice of what the… claim is and the ground upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (alteration in original) (internal quotation marks omitted) (*quoting Twombly*, 550 U.S. at 555); *McZeal v. Sprint*

*Nextel Corp.*, 501 F.3d 1354, 1357 (Fed.Cir. 2007) (*citing Twombly*, 550 U.S. at 565 n.10).

The Federal Circuit recently address the standard for pleading infringement reaffirming that it has never recognized a difference between pleading under old Form 18, Fed.R.Civ.P., and pleading under *Iqbal/Twombly* pleading standard. *Disc Disease Sols. Inc. v. VGH Sols., Inc.*, 888 F.3d 1256, 1259 n.3 (Fed.Cir. 2018). The complaint in *Disc Disease* attached the asserted patents, which consisted of four independent claims, identified the accused products by name and attached photos of packaging, and alleged that the accused products meet "each and every element of at least one claim [of the asserted patents] either literally or equivalently." *Id.* at 1260. The Federal Circuit held that the complaint satisfied the *Iqbal/Twombly* standard. *Id.*

## V.    ARGUMENT

The claims of the '304 patent are directed to patent-eligible subject matter under §101. The claims are not directed to "transmitting information from multiple sensors." Instead, the claims improve the efficient bandwidth usage for the wireless transmission of data from local data sensors having substantially different data transmission rates. The claims are therefore patent eligible because they are necessarily rooted in computer technology to overcome a problem specifically arising in the realm of computer networks. In the second step of the §101 analysis, the claims are more than drafted to monopolize "transmitting information from multiple sensors." The claims are different from many other attempts to solve the problem in the same area of "transmitting information from multiple sensors." Furthermore, the claims solve a problem in a specific way: the communications channel is divided asymmetrically so that the sub-channels are unequal, and data from the data sensor is assigned to one or groups of the sub-channels in accordance with the substantially different data rate requirements. The claims therefore do not monopolize "transmitting information from multiple sensors."

As for Magnacross's pleading of direct infringement, Magnacross's Complaint sufficiently pleads infringement to put ABP on fair notice of the accusation and the basis for the allegation.

ABP's Motion should therefore be denied.

### A.   The Claims are Patentable Under 35 U.S.C. §101

Under the first step of the §101 analysis, Defendant makes the overbroad assertion that the claims are directed to abstract idea of "transmitting information from multiple sensors." This is an overbroad description of the field in which the problem lies, not what the claims are directed to. As explained in the '304 patent, there were problems with the efficient wireless transmission of data from multiple sensor and many failed attempts to solve the problems. The claims are not directed to generally transmitting information from multiple sensors. Instead, the inventors recognized a particular problem with the transmission of data from multiple sensors, namely inefficient bandwidth utilization and then invented a specific new method and apparatus to more efficiently use bandwidth to transmit data from sensors with substantially different data rates. (*See id.* at col. 3:2-27; col. 7:30-45; col. 8:20-35). This is not an abstract idea.

Even if the Court were to agree that the claims are directed to the idea of "transmitting information from multiple sensors," under the second step of the §101 analysis, the claims have additional features to ensure that the claims are more than drafted to monopolize the alleged abstract idea, including (a) a multiplexer being adapted to divide said communications channel asymmetrically whereby the data carrying capacities of said sub-channels are unequal and (b) control means adapted to allocate data from said local data sensors to respective ones or group of said communications sub-channels in accordance with substantially different data rate requirements from said local sensors. The claims are therefore patent-eligible under §101.

### 1.   Claims 1 and 12 Are Directed to Patent-Eligible Subject Matter

The claimed inventions are patent-eligible under §101 because they do not recite an

abstract idea.  In the context of computer software, the Federal Circuit held that the inquiry in the first step is "whether the focus of the claims is on the specific asserted improvement in computer capabilities… or instead, on a process that qualifies as an 'abstract idea.'"  *Enfish*, 822 F.3d at 1335-36.  The claims here are directed to improved computer functionality and do not recite a mathematical algorithm, an economic practice, or a pre-computer business practice.  *Id.* at 1336; *DDR Holdings*, 773 F.3d at 1257; *McRO*, 837 F.3d at 1314.  The claims are patent-eligible because they are rooted in a particular computer technology that necessarily requires a computer system and enable the system to do things better than it could do before.  *Enfish*, 822 F.3d at 1336; *Finjan*, 879 F.3d at 1305; *Core Wireless Licensing v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed.Cir. 2018).

### a)    Claims 1 & 12 Do Not Recite an Abstract Idea

The focus of claims 1 and 12 is on a specific asserted improvement in computer capabilities by solving problems related to efficiently transmitting data wirelessly to data processors from multiple data sensors.  (Ex. A at col. 1:4-7, col. 1:50 – 2:1; col. 2:5-13).  More specifically, the claims improve upon the transmission of data from sensors have substantially different data transmission requirements.  (*Id.*).  In prior art systems, the different data transmission rates for the data sensors resulted in inefficient bandwidth utilization during the wireless transmission of data from data sensors to data processors.  (*Id.*).  The claims solve this problem in a particular way: dividing a wireless communications channel into asymmetrical sub-channels so that the data carrying capacities of the subchannels are unequal, and allocating data from the data sensors to the sub-channels in accordance with the data carrying capacities of the sub-channels.  (*Id.* at col. 7:37-45, col. 8:27-35).

The specification and prosecution also support that the problem solved is one that solely exists when wirelessly transmitting data from multiple data sensors.  *See Enfish*, 822 F.3d at 1337 (looking to the specification to find benefits over the prior art); *McRO*, 837 F.3d at 1314; *Core*

10

*Wireless*, 880 F.3d 1363.  The specification explains that the prior art had problems with efficient bandwidth utilization using conventional wireless transmission systems.  (*Id.* at col. 1:50–2:1).  The specification cites to a dozen U.S. and foreign patents to explain other attempts to solve the problem that failed.  (*Id.* at col. 2:27-59).  The specification and claims describe the specific apparatus and method by which a communications channel would be asymmetrically divided into sub-channels with unequal data carrying capacities, and data from data sensors would be allocated to the sub-channels in accordance with the substantially different data rate requirements of the sensors. (Ex. A at col. 7:37-39, 43-45, col. 8:27-35; *also* col. 1:60-col. 2:13; Ex. B at 8).  Finally, the specification explains that the invention solved the problem with a more "economical use of the available bandwidth" for the transmission of data from local data sensors with substantially different data rate requirements.  (Ex. A at col. 3:8-18).  The claims are therefore patent-eligible because they are "necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks."  *DDR Holdings*, 773 F.3d at 1257; *also id.* at 1256-57; *Enfish*, 822 F.3d at 1339; *McRO*, 837 F.3d at 1313, 1316.

The claims implement the invention using a specific structure for dividing the communications channel and allocating data from the sensors.  (Ex. A at col. 7:37-39, 43-45, col. 8:27-35; *also* col. 1:60-col. 2:13; Ex. B at 8).  Claim 12 is an apparatus claim requiring specific hardware and software to perform the operations: a multiplexer, transmitter, and control means. The multiplexer is a new type of multiplexer that is adapted to divide a communications channels asymmetrically so that the data carrying capacities of the sub-channels are unequal.  (Ex. A at col. 8:27-30).  Furthermore, the control means is also new because it allocates data from local data sensors to one or a group of communications sub-channels in accordance with substantially different data rate requirements from the local data sensors.  (*Id.* at col. 8:31-35).  The patent has

11

examples of the implementation of the new multiplexer, transmitter and control means in Figures 2 and 4. (*Id.* at col. 5:53 – col. 6:16; Figs. 2, 4). Claim 1 is a corresponding method claim that likewise requires a specific structure. In claim 1, the communications channel is divided asymmetrically so that the data carrying capacities of the sub-channels are unequal. (*Id.* at col. 7:37-39). Furthermore, the data from the local data sensors must be allocated to one or a group of the subchannels in accordance with the data carry capacities of the sub-channels. (*Id.* at col. 7:43-5). The claims are therefore patent-eligible because they are rooted in computer technology that necessarily requires a computer system and enables the system to do things it could not do before. *Enfish*, 822 F.3d at 1336; *Finjan*, 879 F.3d at 1305; *Core Wireless*, 880 F.3d at 1363. Even Defendant's alleged abstract idea acknowledges that the claims are rooted in computer technology because they require transmitting information from multiple sensors.

### b) Defendant's Abstract Idea Only Describes an Overbroad Field of the Invention and Not What the Claims are Directed to

The Federal Circuit has cautioned against describing claims at such a high level of abstraction that they are untethered to the claim language, yet that is what Defendant did. *Enfish*, 822 F.3d at 1337 (*citing Alice*, 134 S.Ct. at 2354); *also McRO*, 837 F.3d at 1313; *Core Wireless*, 880 F.3d at 1361-62. Defendant makes the overbroad assertion that the claims are directed to the abstract idea of "transmitting information from multiple sensors." This abstract idea oversimplifies the claim language and only provides an overbroad description of the field of the invention, not what the claim is directed to. *McRO*, 837 F.3d at 1313; *Enfish*, 822 F.3d at 1337.

The actual field of the invention is much smaller than the alleged abstract idea. The field of the invention is "wireless transmission of data, through a communications channel comprising at least two local data sensors and a data processing function to receive data from the local sensors." (Ex. A at col. 1:4-7). Defendant's alleged abstract idea of "transmitting information

12

from multiple sensors" would cover a much broader field including wired (*e.g.*, by cable) transmission of data from multiple data sensors, which had different problems including the inconvenience of running cables.  (*Id.* at col. 1:37-50).  The alleged abstract idea is also overbroad because it covers sending data from sensors with the same data rate requirements, which does not have the problem sought to be solved by the patented invention, and the idea does not reference communications channels.  (*Id.* at col. 1:62 – col. 2:63).

The claims of the '304 patent are solving a problem particular to wireless transmission of data from multiple sensors, not general communications that would include wired communications.  More particularly, the claims are solving a problem particular with the wireless transmission of data from multiple sensors that have substantially different data rate requirements, which is inefficient bandwidth usage that resulted from using conventional wireless transmission systems.  (Ex. A at col. 1:62 – col. 2:13).   The patent explains that there were many different patented attempts at solving this problem that failed.  (*Id.* at col. 2:14-59).  Rather than using any of the prior art methods, the inventors more efficiently used bandwidth to transmit data from local data sensors having substantially different date rates in an unconventional way:  (1) asymmetrically dividing a communications channel into sub-channels with unequal data carrying capacities, and (2) allocating data from data sensors to the sub-channels in accordance with the substantially different data rate requirements of the sensors.  (Ex. A at col. 7:37-39, 43-45, col. 8:27-35; *also* col. 1:60-col. 2:13; Ex. B at 8).  By failing to recognize the problem or the particular solution, Defendant's alleged abstract idea is incorrect. *McRO*, 837 F.3d at 1313; *Enfish*, 822 F.3d at 1337.

c)      **Claims 1 and 12 Require a Particular Concrete and Tangible Form that is Unconventional**

Defendant incredibly alleges that the claims "hav[e] no particular concrete or tangible form."  (Dkt. No. 13 at 9).  However, claim 12 requires a multiplexer capable of performing a

particular function, a transmitter, and a control means capable of performing a particular function. (Ex. A at col. 8:20-35).   Claim 12 states that the communications channel is divided by a multiplexer, data is transmitted through sub-channels using a transmitter, and a control means allocates data from the data sensors to the sub-channels in accordance with the substantially different data rate requirements.  (Ex. A at col. 8:23-35).  The multiplexer, transmitter, and control means are specific hardware that are described in the specification.  (*e.g.*, *id.* at col. 6:1-25; Figs. 1, 2, 4 (multiplexer); col. 5:15-64, Figs. 2-3 (transmitter); col. 3:28-43; col. 6:1-16, 29-35; Figs. 2(64), 4 (control means)).

ABP's allegation that the claims are "using only generic and conventional computer equipment operating in routine ways" is contradicted by the specification.  (Dkt. No. 14 at 9). Conventional systems were designed to assign the same bandwidth to different sensors, regardless of the data bandwidth requirements.  (Ex. A at col. 1:57-col. 2:13).  This resulted in inefficient data transmission.  (*Id.*).  The specification identified a dozen foreign and U.S. patents directed to allocating bandwidth that did not solve this problem.  (*Id.* at col. 2:14-59).  The prosecution history likewise disclosed additional prior art patents that did not solve the problem of inefficient bandwidth allocation for data from sensors with different data rates.  (Ex. B at 8).  Recognizing the problems of the prior art, the claims require a unconventional multiplexer adapted to divide said communications channel asymmetrically whereby the data carrying capacities of the sub-channels are unequal.  (Ex. A at col. 8:27-29).

The specification also has two separate examples of the unconventional multiplexer to divide the communications channel asymmetrically.  (Ex. A at col. 5:15 – col. 6:57, Figs. 2-5). The controller also operates in an unconventional manner.  As explained in the claims and the specification, the controller controls the multiplexing function to allocate the data as required by

14

the claims.  (Ex. A at col. 5:25-27; col. 6:7-16). The claims are patent eligible because there is no evidence that the claimed process and apparatus was previously used in the prior art, even if they operate on a general-purpose computer.  *McRO*, 837 F.3d at 1314 ("While the rules are embodied in computer software that is processed by general-purpose computers, Defendant provided no evidence that the process previously used [ ] is the same as the process required by the claims.").

Claim 1 is the corresponding method claim for the apparatus of claim 12.  As a method claim, it claims steps, not equipment, and so it is not required to describe the hardware used.  The language of this claim is no different than the patent-eligible claims in *McRO*, which had no reference to any hardware. 837 F.3d at 1307-1308.  Because reference to new hardware is not required for patentability, ABP's contention that that the claims are not patent eligible because only generic hardware is required is not persuasive.  Whether the invention can be programmed on general purpose communications hardware does not "doom[ ] the claims" because the claims "are directed to an improvement in the functioning of a computer." *Enfish*, 822 F.3d at 1338; *also McRO*, 837 F.3d at 1314;  *Bascom*, 827 F.3d at 1350-51.  This is not a situation in which "general-purpose computer components are added post-hoc to a fundamental economic practice or mathematical equation."  *Enfish*, 822 F.3d at 1339.  Instead, this invention is one that can only exist on computers.

The claims are similar to the claims directed to a set of rules in *McRO*. The claims here are limited to dividing a communications channel into sub-channels and assigning data to the sub-channels in a very specific way.  837 F.3d at 1313.  The claims are limited to dividing the channel using a common characteristic: dividing the communications channel asymmetrically so that the data carrying capacities are unequal.  (Ex. A at col. 7:37-39, col. 8:27-29); *McRO*, 837 F.3d at 1313.  The claims further require that data from multiple sensors with substantially different data

15

transmission requirements are then assigned to those sub-channels in accordance with the substantially different data transmission requirements.  (Ex. A at col. 7:40-45, col. 8:31-35). *McRO* likewise had a general set of rules that were then applied in a particular situation.  837 F.3d at 1313.  Claims 1 and 12 therefore do not use conventional computer equipment.

### d)  Dependent Claims 2-11 and 13-21 Are Not Directed "Transmitting Information from Multiple Sensors"

Defendant makes the unsupported and conclusory contentions that dependent claims 2-11 and 13-21 recite "insignificant or conventional pre- or post-solution activity." (Dkt. No. 13 at 11). Claims 2-4 and 13-15, which depend from claims 1 and 12, respectively, relate to how the communications channel is asymmetrically divided: frequency basis, time-division basis, and packet-switching and interleaving data with an unsymmetrical packet distribution.  (Ex. A at col. 7:46-53; col. 8:36-45).  This is not a "bare idea of transmitting information from multiple sensors," as Defendant contends, and is instead a particular way of asymmetrically dividing a communications subchannel.  Claims 5-11 and 16-21, which depend directly or indirectly from claims 2-4 and 13-15, respectively, further relate to the use of particular sensors and ways of communicating, which again are not a "bare idea of transmitting information from multiple sensors."  The dependent claims therefore are also not direct to the abstract idea of "transmitting information from multiple sensors."

### 2.  The Claims Include Inventive Steps

Even if the Court finds that Defendant's alleged abstract idea is applicable to the claims, the claims are patent eligible under the second step of the §101 analysis.  The second step of a §101 analysis "examine[s] the elements of the claim [individually and as an ordered combination] to determine whether it contains an 'inventive concept' sufficient to 'transform' the claimed

abstract idea into a patent-eligible application."  *Alice*, 134 S.Ct. at 2357.  ABP's analysis is superficial and does not address the limitations individually or as an ordered combination.

The inventive concept of the claims is found in two significant limitations that distinguish the claims from the abstract idea: dividing the communications channel asymmetrically whereby the data carrying capacities of the sub-channels are unequal; and allocating data from the data sensors to the sub-channels according to the substantially different data rate requirements.  (Ex. A at col. 7:37-39, 43-45, col. 8:27-35).  The specification explains that prior art multiplexing and data allocation systems inefficiently used bandwidth.  (Ex. A at col. 1:60-col. 2:59)  These two limitations achieved "the economical use of the available bandwidth" thereby improving upon the prior art that suffered from "non-utilisation of sub-channel bandwidths for significant numbers of sensors whereby the overall utilisation of data transmission, capacity allocation has been very far from perfect."  (*Id.* at col. 3:11-27; *generally* col. 2:65-col. 3:27).  As explained above, none of these limitations are conventional or generic.  When the claims contain limitations "directed to the arguably unconventional inventive concept described in the specification," the specification supports improved computer functionality.  *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1370 (Fed.Cir. 2018).  The prosecution history, in both a response to an office action and the Notice of Allowability, also used these same two limitations to distinguish the claims from the prior art.  (Ex. B at 8; Ex. C).

Defendant's argument that certain elements of the claimed invention are generic or conventional merely because they are in the prior art has been rejected by the Federal Circuit. "Whether a particular technology is well-understood, routine, and conventional goes beyond what was simply known in the prior art.  The mere fact that something is disclosed in a piece of prior art, for example, does not mean it was well-understood, routine, and conventional."  *Berkheimer*,

17

881 F.3d at 1369 (Fed.Cir. 2018).  Defendant's argument is therefore not supported by the evidence in the record.  Both the specification and prosecution history explain that the claimed invention was not routine and was unconventional because it improved the efficiency of bandwidth usage of wireless data transmissions in certain situations.  (Ex. A at col. 2:65-col. 3:11).

Defendant cites to cases that have nothing to do with the claims at issue here.  (*See* Dkt. No. 13 at 13-14).  In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S.Ct. 2347 (2014), the claim was a business method directed to the concept of intermediated settlement.  *Id.* at 2356.  The Supreme Court found that "[n]early every computer would include" a data processing system, communications controller, and data storage unit.  *Id.* at 2360.  In this case, generic computers would not contain a multiplexer that divides a wireless communications channel asymmetrically such that the data carrying capacities are unequal, or the control means that allocates the data in the particular way required by the claims.  (Ex. A at col. 8:27-33; *also* col. 7:37-45).  *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350 (Fed.Cir. 2016), *Intellectual Ventures I LLC v. Capital One Bank (USA)*, 792 F.3d 1363, 1367-71 (Fed.Cir. 2015), and *DealerTrack, Inc. v. Huber*, 674 F.3d 1315, 1319-20 (Fed.Cir. 2012) involved data collection and analysis, which is not at issue in these claims, which instead relate to how to more efficiently use bandwidth to transmit data from data sensors. None of the claim language relates to data collection or analysis.

The claims therefore do not merely recite the alleged abstract idea "along with the requirement… to perform it on a set of generic computer components."  *Bascom*, 827 F.3d at 1350.  "Nor do the claims preempt all ways" of transmitting information from multiple sensors.  *See id.*; *also McRO*, 837 F.3d at 1315.  Instead, the claims provide a new and improved method and system that more efficiently use bandwidth for the transmission of data from multiple data sensors with substantially different data rate requirements, which is performed in a specific new way.  (Ex. A

18

at col. 3:2-27).  The claims are therefore patent-eligible under the second step of the §101 analysis.

**B.     Magnacross Has Sufficiently Alleged Direct Infringement of Claim 12**

ABP contends that Magnacross's complaint only "formulaically recites the claim elements." (Dkt. No. 13 at 15).  This argument is then contradicted by ABP's acknowledgment that Magnacross pointed to specific aspects of the accused instrumentality that provide factual support for how the accused instrumentality infringes the claims.  (*Id.*).  Regardless, ABP overstates the requirements for pleading infringement.

All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8(a)(2), Fed.R.Civ.P.  There is no "heightened fact pleading of specifics," and instead a complaint is only required to have allegations sufficient to show that the plaintiff is plausibly entitled to relief.  *Twombly*, 550 U.S. at 555-56, 570.  Specific facts are not necessary; Magnacross only needs to give ABP "fair notice" of what the claim is and on what it is based, which Magnacross did.   *Erickson*, 551 U.S. at 93; *McZeal*, 501 F.3d at 1357.  Magnacross identified an accused product, identified the aspect of the accused product relevant to the infringement analysis including compliance with the 802.11b/g and 802.11n wireless specifications, and explained the aspects of the product that satisfy limitations of the claim.

Magnacross's direct infringement allegations are more detailed than a complaint recently held sufficient by the Federal Circuit.  In *Disc Disease*, the complaint attached the asserted patents with four independent claims, identified the accused products by name and attached photos of packaging, and alleged that the accused products meet "each and every element of at least one claim [of the asserted patents] either literally or equivalently."  *Disc Disease*, 888 F.3d at 1260. Magnacross's complaint attaches the '304 patent, alleges infringement of each limitations of one independent claim, identifies the accused instrumentality by name (Dkt. No. 1 at ¶13 (DrayTek AP 902 Wireless Access Point and AP 910C Wireless Access Point)), describes the particular

aspects of the accused instrumentality that satisfy the claim limitations, and incorporates the product specifications describing the operation and parts of the accused instrumentality. (Dkt. No. 1 at ¶¶13-14). Under *Disc Disease* and *Iqbal/Twombly*, these allegations are sufficient to support an allegation of direct infringement. *Disc Disease*, 888 F.3d at 1260.

However, in the event the Court finds that additional facts should be pleaded, Magnacross requests that the Court grant Magnacross leave to file an amended complaint to address any perceived deficiencies.

### CONCLUSION

For the foregoing reasons, Defendant's Motion to Dismiss should be denied.

Dated: December 18, 2018                    Respectfully submitted,


                                            /s/Jay Johnson
                                            **JAY JOHNSON**
OF COUNSEL:                                 State Bar No. 24067322
                                            **D. BRADLEY KIZZIA**
                                            State Bar No. 11547550
David R. Bennett                            **KIZZIA JOHNSON, PLLC**
(admitted *pro hac vice*)                   1910 Pacific Ave., Suite 13000
Direction IP Law                           Dallas, Texas 75201
P.O. Box 14184                             (214) 451-0164
Chicago, IL 60614-0184                     Fax: (214) 451-0165
(312) 291-1667                             jay@kpllc.com
dbennett@directionip.com                   bkizzia@kpllc.com

                                            *Attorneys for Plaintiff Magnacross LLC*

20

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on all counsel of record who have appeared in this case on December 18, 2018, and who are deemed to have consented to electronic service via the Court's CM/ECF system pursuant to Local Rule CV-5.1(d).

*/s/Jay Johnson*
Jay Johnson

21